UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CLAY SCOTT BAKER, an Idaho Resident,<br><br>      Plaintiff,<br><br>   v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>     Defendant. | Case No. 4:14-cv-209-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Plaintiff Clay Scott Baker brings this action against Defendant Hartford Life and Accident Insurance Company claiming wrongful denial of disability benefits under 29 U.S.C. § 1132(a)(1)(B). The parties have filed cross-motions for summary judgment. The motions were argued on February 17, 2015, and taken under advisement. Having considered the record and pleadings, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## BACKGROUND

This is an Employment and Retirement Income Security Act ("ERISA") case. Hartford Life and Accident Insurance Company issued a group long term disability ("LTD") Plan to Intermountain Medical Clinic. *Admin. Rec.* at 39, Dkt. 23-1. Baker is a former dermatologist of Intermountain who submitted a claim for LTD benefits under the

Plan based on mycotoxicosis, which is exposure to mold toxins. *Admin. Rec.* at 1155-63,

1174-75, Dkt. 23-25. To be eligible for coverage, the Plan requires, in relevant part, that:

> Your Disability must be the result of:
> 1) accidental bodily injury;
> 2) sickness; [or]
> 3) Mental Illness;
> …
> Mental Illness means a mental disorder as listed in the current
> version of the Diagnostic and Statistical Manual of Mental
> Disorders, published by the American Psychiatric
> Association. A Mental Illness may be caused by biological
> factors or result in physical symptoms or manifestations.

R., 30-31, Dkt. 23-1. However, the Plan limits benefits as follows:

> Mental Illness And Substance Abuse Benefits: Are benefits
> limited for Mental Illness? If You are Disabled because of:
> 1) Mental Illness that results from any cause; [or]
> 2) any condition that may result from Mental Illness;
> …
> then subject to all other provisions of The Policy, We will
> limit the Maximum Duration of Benefits.
>
> Benefits will be payable:
> 1) for as long as you are confined in a . . . place licensed to
> provide medical care for the disabling condition; or
> 2) if not confined, or after you are discharged and still
> Disabled, for a total of 24 month(s) for all such disabilities
> during your lifetime.

*Id.* at 21.

Hartford engaged two of its medical professionals, a Medical Care Manager

("MCM") and a Behavioral Health Care Manager ("BHCM"), to evaluate Baker's

medical records. *Admin. Rec.* at 86-87, Dkt. 23-2. The BHCM, after speaking with

Baker and his psychiatrist, Dr. Soofi, ordered an independent psychiatric review from the

third party vendor MES Solutions ("MES"). *Id.* at 77-79. Dr. Jean Dalpe, a psychiatrist

engaged by MES, determined that Baker's disability was due to psychiatric conditions. *Admin. Rec.* at 577, Dkt. 23-13.  In Hartford's denial letter, dated May 30, 2013, Hartford indicated that it had reviewed records and reports from Drs. Soofi, Reichman, Sponangle, Hooper, Kennedy, Dalpe, the MCM, and the BHCM, as well as lab reports, diagnostic tests, medical records, and conversations with Dr. Soofi.  *Admin. Rec.* at 126, Dkt. 23-3.

On July 16, 2013, Baker submitted additional materials from his providers. *Admin. Rec.* at 545, 555, Dkts. 23-12, 23-13.  Hartford reviewed the materials, again denied coverage, and encouraged Baker to submit an appeal.  *Admin. Rec.* at 122, Dkt. 23-3.  Over the next three months, Baker appealed and submitted a neuropsychological report by Dr. Didriksen, as well as records from Drs. Rea and Soofi.  *Admin. Rec.* at 220, 252, Dkts. 23-5, 23-6.  Upon receiving the additional documentation, Hartford engaged the third party vendor University Disability Consortium ("UDC") to review Baker's file. *Admin. Rec.* at 211-12, Dkt. 23-5.  UDC assigned the review to three physicians with different specialties: Dr. Ruffell (psychiatry), Dr. King (neurology), and Dr. Caruso (occupational medicine).  *Admin. Rec.* at 180, 194, 210, Dkts. 23-4, 23-5.  Based upon his review, Dr. Ruffell diagnosed Baker with Bipolar Affective Disorder.  *Admin. Rec.* at 209, Dkt. 23-5.  Dr. King found that Baker would not, from a neurological perspective, be precluded from work."  *Admin. Rec.* at 193, Dkt. 23-4.  And Dr. Caruso questioned the accuracy of the testing and methods used to diagnose Baker with mycotoxicosis.  *See id.* at 169-76.

On November 26, 2013, Hartford concluded that Baker "meets the definition of disability and is eligible for LTD benefits." *Admin. Rec.* at 113, Dkt. 23-3. Two weeks later, Hartford issued an appeal letter in which it found that "Dr. Baker was unable to perform the Essential Duties of his occupation due to symptoms and impairment resulting from Major Depression. The Appellate Review further shows there is no supported Disability from a physical perspective." *Admin. Rec.* at 108-10, Dkt. 23-3. Accordingly, Hartford limited LTD benefits to the 24-month period set forth in the Plan. *Id.*

Baker submitted a second appeal on March 11, 2014, but failed to submit any new medical evidence. *Admin. Rec.* at 161-62, Dkt. 23-4. In Hartford's response to the second appeal, it explained:

> since we have determined that Dr. Baker was not physically precluded from working and has already exhausted the maximum duration of benefits payable due to any Mental Illnesses he may suffer from, we are maintaining the prior determination to terminate this [sic] LTD benefits as of December 28, 2103. This determination regarding eligibility for benefits as described in the above analysis represents our final decision on this claim.

*Admin. Rec.* at 104, Dkt. 23-3.

Baker sued under 29 U.S.C. § 1132(a)(1)(B), the provision of ERISA allowing for civil actions to recover benefits under an ERISA plan. The parties have filed cross-motions for summary judgment. *See* Dkts. 24, 25.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact

"that may affect the outcome of the case." *Id.* at 248. The Court must be "guided by the

substantive evidentiary standards that apply to the case." *Id.* at 255.

When cross-motions for summary judgment are filed, the Court must

independently search the record for factual disputes. *Fair Hous. Council of Riverside*

*Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-

motions for summary judgment – where both parties essentially assert that there are no

material factual disputes – does not vitiate the court's responsibility to determine whether

disputes as to material fact are present. *Id.*

## ANALYSIS

## 1.    Hartford's Decision is Reviewed under an Abuse of Discretion Standard.

"ERISA is a comprehensive statute designed to promote the interest of employees

and their beneficiaries in employee benefit plans." *Ingersoll–Rand Co. v. McClendon*,

498 U.S. 133, 136 (1990) (quotation citation omitted). ERISA requires that a plan

fiduciary administer an ERISA plan for the purpose of "providing benefits to participants

and their beneficiaries" and "in accordance with the documents and instruments

governing the plan." 29 U.S.C. § 1104(a)(1)(A)(i), (a)(1)(D). However, "[a]n ERISA

fiduciary is obligated to guard the assets of the [Plan] from improper claims, as well as to

pay legitimate claims." *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005) (internal

quotation marks omitted).

In actions challenging denials of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B),

the district court reviews *de novo* "unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the

terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). If

the plan unambiguously confers discretionary authority, then the standard of review shifts

to an abuse of discretion standard. *Id.*

The first step of the analysis is to determine whether the Plan unambiguously

grants discretion to the administrator. The insurance policy provides, "[t]he Plan has

designated and named the Insurance Company as the claims fiduciary for benefits

provided under the policy. The Plan has granted the Insurance Company full discretion

and authority to determine eligibility for benefits and to construe and interpret all terms

and provisions of the Policy." *Admin. Rec.* at 41, Dkt. 23-1.

The Ninth Circuit has repeatedly held that such plan language—granting the

power to interpret plan terms and to make final benefits determinations—confers

discretion on the plan administrator. *See Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006) (*citing Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139, 1142 (9th Cir. 2002) and *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1159 (9th Cir. 2001)). Therefore, the Plan unambiguously confers on the administrator full discretion and authority to both interpret all terms and provisions of the Plan and to determine eligibility for benefits. Accordingly, the Court will proceed to review the Plan administrator's decision under the deferential abuse of discretion standard.

2.     **The Court's Deference to the Administrator's Decision is Tempered by the Degree of the Severity of any Structural Conflict of Interest**

In the absence of an internal conflict, an ERISA administrator abuses its discretion only if the administrator "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd*, 410 F.3d at 1178. However, a less deferential standard is triggered when a structural conflict of interest exists. *Firestone*, 489 U.S. at 115. If the administrator or fiduciary having discretion is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion." *Id.* This language does not imply a change in the standard of review, but merely instructs courts to "take account of several different considerations of which a conflict of interest is one." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Stated another way, the Court's review of the administrator's decision will be "tempered by skepticism" to the degree of the severity of the conflict. *Abatie*, 458 F.3d at 959. A conflict of interest may be weighed "more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Id.* at 968-69.

In order to weigh a conflict of interest more heavily, the beneficiary must provide "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999). If the beneficiary meets this threshold burden, then a rebuttable presumption arises in favor of the beneficiary. *Id.* The Plan then bears the burden of rebutting this presumption by producing evidence that the conflict of interest did not affect its decision to deny benefits. *Id.* If the Plan fails to carry this burden, then the Court will review the denial of benefits *de novo. Id.*

It is undisputed that Hartford is operating under a conflict of interest by serving as both claim administrator and payer of LTD benefits. Therefore, the Court proceeds to determine the extent to which the conflict tempers its deference to Hartford's decision.

## A.      *Hartford has taken steps to reduce potential bias*

The Supreme Court recognized that a structural conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits." *Metropolitan Life Ins. Co.*, 554 U.S. at 117.  As described in Hartford's Response to Baker's Interrogatory No. 4:

> Hartford's claims personnel do not have access to or knowledge of financial information regarding the policyholder, nor are claims personnel provided with information regarding claim reserves. Profitability and other financial information do not weigh in to the claims decision.
> …
> [A]n examiner's compensation is not determined by reference to his or her record in denying claims. The claims personnel are separate from and are not involved with those persons responsible for Hartford's financial operations and decisions. Claims investigations and decisions are made separately from, and without consideration of, the financial affairs of Hartford.
> …
> The office of the Chief Financial Officer of Hartford and its affiliate, subsidiary, or parent companies does not have any involvement and does not participate in claim or appeal determinations at any level.
> …
> Claims personnel are not reviewed or compensated based on the outcome of their claim determinations. Hartford does not establish numerical quotas requiring a certain number of claim approvals versus denials, and does not evaluate its employees on the number of claims approved versus denied. Hartford compensates members of the claims department and appeals unit in accordance with the terms of their individual

> employment with Hartford. Claim personnel do not receive
> benefits, bonuses, commissions, promotions, or any other
> incentives, financial or otherwise, based on the number of
> claims that they approve versus deny.
> …
> Hartford has a check against the arbitrary denial of claims and
> promotes accuracy by maintaining a separate appeals unit for
> the independent consideration of denied claims. Members of
> the appeals unit are charged with making independent
> assessments of the underlying claim decision based on all of
> the evidence in the claim file. When a claim denial is
> appealed, the entire claim file, including the appeal
> investigation and the decision on which the appeal is based, is
> assigned to an Appeals Specialist in the appeals unit who had
> no involvement in the initial investigation and claim
> determination. The Appeals Specialist investigating and
> deciding the appeal has the sole authority to make the appeal
> decision.

*Decl. of Jack Englert*, Ex. A at 6-7, Dkt. 24-3.

Clearly Hartford took active steps to reduce potential bias and promote accuracy.

Accordingly, the Court should give little weight to the conflict.  Nevertheless, the Court

must consider all the circumstances surrounding the claim decision.

Baker points to three factors that he argues should result in a less deferential

review of Hartford's decision: (1) Hartford took inconsistent positions throughout the

claim process; (2) Hartford failed to adequately investigate Baker's claim; and (3)

Hartford's findings were clearly erroneous.  *Pl.'s Br.* at 5, Dkt. 26.

### B.    *Hartford did not take inconsistent positions throughout the claim process*

Baker maintains that Hartford took inconsistent positions throughout the claims

process.  First, on May 30, 2013, Hartford denied Baker's LTD claim and concluded that

Baker did not suffer from a disability.  *Admin. Rec.* at 122-28, Dkt. 23-3.  Subsequent to

an appeal, on November 26, 2013, Hartford concluded that Baker "meets the definition of disability and is eligible for LTD benefits." *Id.* at 113. Two weeks later, on December 10, 2013, Hartford issued a detailed appeal letter in which it found that Baker's disability was the result of a mental illness and LTD benefits were limited to the 24-month period set forth in the Plan. *Id.* at 108-10. Baker contends that these decisions and letters illustrate that Hartford took inconsistent positions and that its position changed as a result of "obtaining paid for conclusions from its experts." *Pl.'s Br.* at 6, Dkt. 26.

However, the record reveals that Hartford did not take an inconsistent position during the claims process and was not operating under a conflict of interest. After the initial denial, Hartford informed Baker that he could appeal, should he choose to challenge Hartford's claim determination. *Admin. Rec.* at 122, 545, 555, Dkts. 23-3, 23-12, 23-13. Upon receipt of the additional documentation, Hartford obtained independent physician reviews and received reports from these physicians on November 20, 2013. *Admin. Rec.* at 167, 184, 195, Dkt. 23-4. On November 26, 2013, Hartford sent a letter to Baker indicating that "[b]ased on review of the documentation in Dr. Baker's claim file together with additional medical information obtained at the appeal level we have determined that he meets the definition of disability and is eligible for LTD benefits." *Admin. Rec.* at 113, Dkt. 23-3.

The November 26 letter indicated that the review was "conducted separately from the individual who made the original decision to deny benefits and without deference to said decision." *Id.* Moreover, the appeals determination considered additional medical

information provided by Baker and reports of the reviewing physicians. This is not evidence of an inconsistent position due to a conflict of interest. Instead, it suggests that the change in claim determination between the initial determination and the November 26 letter resulted from an appeals process which gave no deference to the initial claim determination. Furthermore, Dr. Sponaugle admits that the "initial evaluation of [Baker's] disability claim is a moot point" because, in Dr. Sponaugle's opinion, Baker was not accurately diagnosed until April 2012. *Admin. Rec.* at 470, Dkt. 23-11.

The November 26 letter further indicated that "[b]ased on review of the documentation in Dr. Baker's claim file together with additional medical information obtained at the appeal level we have determined that he meets the definition of disability and is eligible for LTD benefits." *Admin. Rec.* at 113, Dkt. 23-3. Notably, the November 26 letter does not indicate the nature of the disability or the term or value of the LTD benefits. On December 10, 2013, Hartford issued a formal determination letter in which it stated "[t]he Appellate Review completed for your client's claim shows that Dr. Baker was unable to perform the Essential Duties of his occupation due to symptoms and impairment resulting from Major Depression. The Appellate Review further shows there is no supported Disability from a physical perspective." *Id.* at 109-110, Dkt. 23-3. Additionally, the December 10 letter indicated that Hartford considered the November 20 physician reports in its determination before sending the November 26 letter. *Id.*

Consistent with the December 10 letter, Hartford's internal file note dated November 26, 2013, 1:45:37 PM states that the "appeal decision is to reverse denial and

pay benefits *based on Dr. Baker's psychiatric disorder*." *Admin. Rec.* at 61, Dkt. 23-2.

(emphasis added). As such, both the November 26 and December 10 letters were

premised on an award from Baker's disability due to a psychiatric disorder. Accordingly,

Hartford has not offered inconsistent positions due to any structural conflict of interest.[1]

**C.** *Hartford adequately investigated Baker's claim*

When considering a claim for benefits, ERISA administrators have a duty to

adequately investigate the claim. *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461,

1463 (9th Cir. 1997). This requires that the plan administrator engage in "meaningful

dialogue" with the beneficiary. *Id.* If the administrator "believes more information is

needed to make a reasoned decision, they must ask for it." *Id.*

When investigating Baker's claim, Hartford interviewed Baker about his LTD

claim and reviewed the records provided by his health care providers. *Admin. Rec.* at 86-

93, Dkt. 23-2. Two of Hartford's on-staff medical professionals, a Medical Care

Manager ("MCM") and a Behavioral Health Care Manager ("BHCM"), evaluated

Baker's medical records. *Id.* at 86-87. The BHCM, after speaking with Baker and his

---

[1] Baker makes much of the fact that Hartford changed its position after "obtaining paid for conclusions from its experts." *Pl.'s Br.* at 6, Dkt. 26. This is a facetious argument. A plan administrator is certainly permitted, and in light of its fiduciary obligation to plan participants is probably obligated, to obtain opinions from physicians other than the claimant's own doctors. And, certainly those physicians will expect to be compensated for their time in reviewing records, conducting interviews, examining the claimant, and formulating an opinion.

psychiatrist, ordered an independent psychiatric review. *Id.* at 77-79. Psychiatrist Dr.

Jean Dalpe performed an independent review. *Admin. Rec.* at 577, Dkt. 23-13. In the

denial letter, dated May 30, 2013, Hartford indicated that it had reviewed records and

reports from Drs. Soofi, Reichman, Spongangle, Hooper, Kennedy, Dalpe, the MCM, and

the BHCM, as well as lab reports, diagnostic tests, and medical records. *Admin. Rec.* at

126, Dkt. 23-3.

On July 16, 2013, Baker submitted additional materials, which were reviewed by

Hartford. *Admin. Rec.* at 545, 555, Dkts. 23-11, 23-12. Baker filed an appeal and

submitted a neuropsychological report by Dr. Didriksen, as well as additional records

from Drs. Rea and Soofi. *Admin. Rec.* at 220, 252, Dkts. 23-5, 23-6. As part of its

independent review process, Hartford engaged UDC, which assigned the review to three

of its physicians. *Admin. Rec.* at 180, 194, 210, Dkts. 23-4, 23-5. In addition to

reviewing the record, UDC's physicians consulted with Baker's primary physicians. All

of UDC's physicians summarized the record and created reports detailing their findings.

Although the UDC physicians criticized the disabling effects of the mycotoxicosis

diagnosis, Baker failed to provide evidence to the contrary when he filed his second

appeal on March 11, 2014. *See Admin. Rec.* at 158-59, Dkt. 23-4. It is significant that

Baker chose only to highlight records and reports that had been previously considered.

Among other concerns, Baker chose not to address an adverse article by The American

College of Occupational and Environmental Medicine, the position of the Society of

Nuclear Medicine Brain Imaging Council and the reviewing physicians regarding SPECT

scans, or alleged criticism of Dr. Rea's standards by the Texas Board of Medicine and the American Board of Allergy. Moreover, reports submitted after the second appeal determination failed to address the same condemning information in the record.

The Court finds that Hartford conducted a more than adequate investigation of Baker's claim. Hartford and the reviewing physicians engaged in "meaningful dialogue" with Baker and his physicians, requested additional documents, and gave Baker ample opportunity to supplement their investigation with additional evidence. Further, Hartford used independent physicians who gave no deference to the initial claim determination when reviewing Baker's claims.

### D. *Hartford findings were not clearly erroneous*

Baker maintains that "Hartford's denial was clearly erroneous because "several medical providers… all concluded that Dr. Baker was disabled due to mold and chemical exposure." *Pl. Br.* at 7, Dkt. 26. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing [body] on the *entire evidence* is left with the *definite and firm* conviction that a mistake has been committed." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (emphasis added). Moreover, "that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir. 1996), *overruled on other grounds by Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999) (en banc).

As a result of the abuse of discretion standard, courts "have generally limited the record for judicial review to the administrative record compiled during internal review." *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 613 (2013). Accordingly, the Court will limit its review to the administrative record created during the initial determination and appeals process.

Baker claims the record supports disability due to a physical condition— mycotoxicosis or chemical sensitivity—while Hartford's claim determination points to a psychiatric disorder. There appears to be conflicting reports as to what caused Baker's disability. Baker's psychiatrist, Dr. Soofi, indicated a secondary diagnosis of mycotoxicosis in her Attending Physician's Statement of Disability. *Admin. Rec.* at 248, Dkt. 23-5. However, in her medical notes, Dr. Soofi stated, "I basically have minimal knowledge of how mold toxin can look like [in] somebody who has bipolar disorder, panic disorder, attention deficit-hyperactivity disorder basically most of the psychiatric major diagnoses. Nevertheless, I have been supportive and [am] keeping an open mind." *Admin. Rec.* at 637, Dkt. 23-14. In a conversation with Dr. Ruffell, she qualified that it would "be extremely difficult for [Baker] to buy into [his illness] being psychiatric." *Admin. Rec.* at 206, Dkt. 23-5. As further evidence of Dr. Soofi's skepticism, she wrote in her patient notes that "[Baker] still is in the process of testing his theory that his primary problem is [mycotoxicosis]," "[Baker] continued to research literature on mold toxicity and found a physician in Texas," "he wants to test his theory of immunotherapy," "he except[s] my opinion that he has a depressive disorder," and "he feels that he's not

[in] 'denial' however he is quite convinced with the data that he has been gathering on his own health." *Admin. Rec.* at 462-63, Dkt. 23-11. Thus, it is clear that Dr. Soofi was highly skeptical that Baker's condition could be attributed to mycotoxicosis.

The opinions of Drs. Didriksen, Rea, Hooper, and Sponaugle all support the existence of mycotoxins in Baker's system. However, Dr. Ruffell noted that Baker was referred to Dr. Didriksen by Dr. Rea with a bias toward a diagnosis of "toxic exposure." *Admin. Rec.* at 208, Dkt. 23-5. Additionally, Dr. Rea's diagnosis of mycotoxins relied, at least partly, on "significant testing done prior to coming to our clinic… by Dr. Hooper." R. 267. Thus, much of the mycotoxin results stem from the tests performed by Drs. Hooper and Sponaugle. The record also supports the finding that Baker sought out these doctors because of their focus on mycotoxins. It was Dr. Ruffell's opinion that it is more likely that the "findings are clue to a much more common and well-recognized syndrome – Bipolar Affective Disorder." *Id.* at 209.

Dr. Caruso's report disagrees with the methods and tests administered, from which Drs. Sponaugle, Rea, and Didriksen "drew unvalidated conclusions of clinically significant environmental toxicity." *Admin. Rec.* at 176, Dkt. 23-4. Particularly, Dr. Caruso disagreed with the methodology of Dr. Didriksen. *See Admin. Rec.* at 174, Dkt. 23-4. For example, Dr. Didriksen administered a WAIS-III rather than WAIS-IV test, focused on individual scores when most overall scores were within normal limits, administered a non-standard psychological test, and validated her assertions with "research in this office" without any reference to peer-reviewed studies. *Id.* As a result

of his review, Dr. Caruso determined that "within a reasonable degree of medical certainty, Dr. Baker's primary medical problem was psychiatric in nature." *Id.* at 175.

Dr. Caruso also relied on a position paper of the American College of Occupational and Environmental Medicine, which concluded that "[c]urrent scientific evidence does not support the existence of a causal relationship between inhaled mycotoxins in home, school, or office environments and adverse health effects." *Id.* at 176. It appears from the record that mycotoxicosis is a controversial diagnosis that is not widely recognized in the medical field. Drs. Rea and Sponaugle appear to be among the very small group of physicians who have embraced the diagnosis. For example, Dr. Sponaugle refers to "mycotoxin-mediated human disease [as] grossly under-recognized in the U.S." *Admin. Rec.* at 471, Dkt. 23-11. He also refers to this as an "emerging disease" with "a high likelihood that your physician consultants have never heard of it." *Id.*

Baker's neurologist, Dr. Kennedy, indicated in his Attending Physician's Statement of Disability that Baker had "subacute encephalopathy," but that it was of unknown etiology. *Admin. Rec.* at 246, Dkt. 23-5. In a phone conference with Dr. King, Dr. Kennedy said that "he thought that [Baker's] greatest problems were psychiatric in nature and if he had neurocognitive dysfunction that it would probably be from his psychiatric issues." *Admin. Rec.* at 190, Dkt. 23-4.

Baker contends that Hartford failed to credit the objective testing supporting Baker's mycotoxicosis and chemical sensitivity diagnoses as the basis of his disability.

Admittedly, that testing conducted by Drs. Didriksen, Rea, Hooper, and/or Sponaugle shows that Dr. Baker has experienced high levels of mycotoxins. However, there is no evidence in the record, apart from those doctors' unsupported conclusions, that such toxicity can cause the symptoms which Baker has experienced. While "plan administrators may not arbitrarily refuse to credit reliable evidence, including the opinions of a treating physicians… courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Likewise, this Court has held that "[a] plan administrator does not have to be swayed by the sheer amount of evidence or the source of the evidence." *Wirries v. Reliance Standard Ins. Co.*, No. CV 01-565-E-MHW, 2005 WL 2138682, at *7 (D. Idaho Sept. 1, 2005) aff'd sub nom. *Wirries v. Reliance Standard Life Ins. Co.*, 247 F. App'x 870 (9th Cir. 2007) (citation omitted).

The Court is not left with the definite and firm conviction that a mistake has been committed. Quite to the contrary, the Court concludes that Hartford's conclusion was strongly supported by the record before it. That Hartford accepted the opinions of reviewing physicians who concluded that Baker's disability was attributable to a mental illness, rather than to mycotoxicosis or chemical sensitivity, does not establish that Hartford reached a biased result or ignored evidence. The record is clear that Hartford considered the conclusions of Baker's treating physicians, but ultimately chose to question and reject the diagnosis and the methodology employed by Drs. Sponaugle and

Rea. That skepticism appears justified. Baker's primary physicians expressed their skepticism as to the mycotoxicosis diagnosis. And, the medical literature reviewed by the Hartford physicians shows that the diagnosis is highly controversial and has not found acceptance in the medical community.

### E. *Policy interpretation*

Finally, Baker maintains that "[u]nder Hartford's interpretation of the policy, everyone who has a mental illness, will not be physically disabled." *Pl.'s Br.* at 9, Dkt. 26. Specifically, Baker argues that Hartford's "exclusion of Dr. Baker's disability benefits, under the guise of being a purely mental illness, essentially renders the disability provisions of the Plan nugatory." *Id.*

When considering questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1125 (9th Cir. 2002). Under the federal common law of ERISA, federal courts "interpret terms in ERISA insurance policies in an ordinary and popular sense, as would a person of average intelligence and experience." *Id.* The interpretation of an insurance policy is a question of law, and any ambiguities in the plan are construed against the insurer. *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir. 1990). The Court will accordingly consider whether the Plan's mental illness limitation indeed renders the disability provision of the Plan nugatory.

The Plan provides, in relevant part, that "If You are Disabled because of: 1) Mental Illness that results from any cause; 2) any condition that may result from Mental

Illness… then subject to all other provisions of The Policy, We will limit the Maximum Duration of Benefits. Benefits will be payable… for a total of 24 month(s) for all such disabilities during your lifetime." *Admin. Rec* at 21, Dkt. 23-1.

Baker's interpretation of the Plan overstates the scope of the mental illness limitation. The mental illness limitation does not state that any person who has a mental illness will not be physically disabled; instead, it limits the duration of benefits when the claimant's disability is due to mental illness. A mentally ill claimant may still receive the full duration of benefits so long as the claimant is totally disabled as a result of a physical condition. This interpretation is reasonable and does not conflict with the other Plan terms.

**3.     The Plan Denial of Baker's Request for Benefits Was Reasonable**

The Court finds no reason to temper its deference to Hartford's determination under the abuse of discretion standard. Baker has not provided material and probative evidence showing that Hartford's conflict of interest caused a breach of its obligation to Baker.

Under the abuse of discretion standard, the Court is not called upon to decide whether Baker was disabled as a result of mycotoxicosis or another physical cause. Instead, the inquiry is far more limited. The only issue before the Court is whether, based upon the administrative record, Hartford abused its discretion in concluding that Dr. Baker's disability was due to mental health issues rather than a physical condition. Under this standard, Hartford prevails.

"[W]here the decision to grant or deny ERISA benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question of whether discretion has been abused before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Cady v. Hartford Life & Accidental Ins. Co.*, 930 F. Supp. 2d 1216, 1224 n.11 (D. Idaho 2013) (citation omitted).

A plan administrator's decision "must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 590 (9th Cir. 2010) (quotation citation omitted). Therefore, the question is not "whose interpretation of the plan documents is most persuasive, but whether the ... interpretation is unreasonable." *Canseco v. Const. Laborers Pension Trust*, 93 F.3d 600, 609 (9th Cir. 1996). The reviewing court must look to the plain language of the plan to determine whether the administrator's interpretation of the plan is "arbitrary and capricious." *Id.*

Here, Hartford denied benefits "due to symptoms and impairment resulting from Major Depression [and] no supported Disability from a physical perspective." *Admin. Rec.* at 109-10, Dkt. 23-3. Hartford's decision was grounded on a reasonable factual basis for concluding that Baker's mycotoxicosis or chemical sensitivity, alone, was not disabling, and that, but for his mental illness, he would be able to work. It was within Hartford's discretion to weigh the conflicting evidence, and Hartford did not abuse that discretion in limiting benefits to the 24-month term provided for in the Plan.

**IT IS ORDERED:**

1.      Plaintiff's Motion for Summary Judgment (Dkt. 25) is **DENIED**.

2.      Defendant's Motion for Summary Judgment (Dkt. 24) is **GRANTED**

DATED: February 23, 2015

B. Lynn Winmill
Chief Judge
United States District Court